## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:04-cr-247-J-20TEM

JERMAINE HALL

_____

### REPORT AND RECOMMENDATION[1]

The Court has before it a Motion to Suppress (Doc. # 14) filed by Defendant Jermaine Hall.  The United States has responded (Doc. # 16) and the Court heard evidence at a hearing on April 26, 2005 (Doc. # 22).

### *Findings of Fact*

The essential facts are not disputed by the parties.   At approximately 3:51 a.m. on February 20, 2005, a person later identified as  Kenneth Hunter fired several shots at Yvette Spencer and her house at 818 West Washington Street, Charlestown, W.Va.   The defendant, Jermaine Hall,  resided with Ms. Spencer and five children at the residence.  Ms. Spencer was outside when the shooting started, but ran inside and called 911.   She believed she reported the name of the shooter and a description of his vehicle, but she acknowledged a problem with the phone line at some point that morning.

_____

[1]Any party may file and serve specific, written objections hereto with TEN (10) DAYS after service of this Report and Recommendation.  Failure to do so shall bar the party from a de novo determination by a district judge of an issue covered herein and from attacking factual findings on appeal.  See 28 U.S.C. §636(b)(1); FED.R.CIV.P. 72(a), 6(a) and (e); Local Rules 6.02(a) and 4.20, United States District Court for the Middle District of Florida.
         In this instance the Court requests any objections be filed by the close of business Friday, May 27, 2005.

Patrol Officer Jeffrey Dotson heard the police dispatcher report "shots fired" in the 800 block of West Washington with the suspect believed to be a black male walking on or toward West Avenue. Dotson drove his patrol car toward the area. He was aware of an alley which connected some Washington Street houses to West Orchard Street. He saw a dark colored car being driven from the alley by a black male. Officer Dotson did not initially pursue the vehicle, but shortly thereafter heard Officer Craig Dickinson call in a license number for the vehicle and heard the dispatcher provide the name of Jermaine Hall and an address of 818 West Washington Street. The dispatcher advised he (or she) had heard the name in connection with the shooting, but was not clear if the name was for a victim or suspect.[2] The dispatcher indicated receiving several calls about multiple shots being fired.

Officer Dickinson also heard the initial dispatch, which he recalled included a description of the suspect as a heavy-set black male in dark colored clothing, and was driving to the location when he noticed a vehicle being driven on Washington away from the 800 block at a high rate of speed with no tail lights. He executed a u-turn, gave the dispatcher the license number and followed the vehicle. After the dispatcher reported that "Hall" was a name connected to the shooting incident, he decided to stop the vehicle. The car turned into a convenience store parking lot[3] and Officer Dickinson turned on the patrol

---

[2]The dispatch center also broadcast, at some point, that they believed the suspect name was a person named "Kenneth," with a surname sounding like "Hondo."

[3]Yvette Spencer, the Defendant's fiancé who made the initial 911 call concerning the shooting, testified that the convenience store is her business and the defendant works there. Officer Dickinson testified he did not know that at the time, but later learned that Ms. Spencer owned the store.

car's flashing lights to execute a "high risk stop" based on the shooting report.  He noticed the driver appeared to be moving something in the front seat area.  Officer Dotson arrived at that time.  The defendant left his car and was ordered to get on the ground where he was handcuffed and patted for weapons.  Officer Dotson said he told the defendant he was not under arrest, and asked if he had  weapons in the car.  Officer Dickinson recalled the question as "Do you have any weapons" or something of that nature.

The defendant replied there were two revolvers in the vehicle, one between the driver's seat and center console and one under the passenger seat.  Officer Dotson entered the car, found and seized the two revolvers.[4]

The two officers did not learn until later that Kenneth Hunter was the person who fired the shots at 818 West Washington Street, and Hunter apparently was not arrested until sometime later.  The defendant was wearing a tan shirt and shorts, not dark-colored clothing.  He is a heavy-set black male.

### *Defendant's claim*

Defendant questions whether there was sufficient reason for a *Terry*[5] stop and search of his person, but primarily argues that even if the stop was proper, the police erred in asking him questions without advising him of his Constitutional rights under *Miranda*[6]

_____

[4]Defendant was arrested on a concealed weapons charge.  While driving him to the police station or jail Officer Dotson asked the defendant, who still had not been *Mirandized,* what happened up on Orchard.  The prosecutor stated during argument after the testimony that he would not seek to introduce in his case-in-chief what the defendant stated during the transport.

[5]*Terry v. Ohio*, 392 U.S. 1 (1968)

[6]*Miranda v. Arizona*, 384 U.S. 436 (1966)

3

after he was handcuffed outside his vehicle.  He further claims that the firearms were seized from the vehicle in violation of the Fourth Amendment.[7]

### *United States' position*

The United States relies *New York v. Quarles*, 467 U.S. 649 (1984) to support its argument that the stop was lawful and reasonable under *Terry* and that the question asked about the location of weapons, even though without previous advice of rights, was proper under the public safety exception to *Miranda*.  The government further argues the emergency situation justified the warrantless seizure of two firearms that were inside the vehicle.

### *Analysis*

#### *The Stop*

The Fourth Amendment prohibits "unreasonable searches and seizures."  Generally, that requires an officer to have either probable cause or a valid warrant to effectuate a search or arrest; however, investigative detentions have been allowed in some circumstances.  In *Terry v. Ohio*, 392 U.S. 1, 26 (1968), the Court allowed a brief stop and pat-down frisk for weapons, and questions to be asked of an individual reasonably suspected of criminal activity. An officer may conduct such a stop only upon reasonable, articulable suspicion of criminal activity.  *Id.* at 21-22.  Although a totality of the circumstances analysis is applied, the government must point to specific facts and

---

[7]Defendant was indicted on two firearms charges in this District in 2004, prior to the arrest and search in West Virginia that is the subject of the motion.  The firearms seized from the vehicle are different from those described in the Indictment (Doc. # 1). The United States claimed at the hearing that evidence at trial will show Defendant possessed at least one of the seized firearms in Florida and that the United States will argue the West Virginia incident is admissible under Rule 404(b), Fed. R. Evid.

inferences that reasonably suggest criminal activity has occurred or is imminent.  *Id.*

While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, there must be at least a minimal level of objective justification for making a stop.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

In the instant case, the officers were aware the dispatcher had reported receiving 911 calls of shots being fired at a residence at 818 Washington Street or in that vicinity. The suspect initially was described as a heavy set black male wearing dark clothing.[8]  One officer saw the vehicle driven by the defendant leave the area of an alley near 818 Washington Street.  The officer who pursued the vehicle saw it apparently speeding from the area.  While pursuing the vehicle, he called in the license number to see who owned the vehicle, and learned it was owned by Jermaine Hall at the 818 Washington Street address.

Aside from speeding and a non-functioning taillight, the fact of a vehicle licensed at the address of a reported shooting leaving the area shortly after the shooting at about 4 a.m.  created a reasonable and articulable suspicion of criminal activity.  The officers did not know who was driving the vehicle.  One of the officers testified that he didn't know if the driver was a "victim, suspect or witness."  An individual's proximity to illegal activities may be considered in determining whether the totality of the circumstances demonstrates a

---

[8]The 911 calls were not played in court.  The only evidence is what the officers recall the dispatcher broadcasting.  Ms. Spencer testified what she recalled telling the dispatcher, which apparently was more than the dispatcher broadcast,  but Ms. Spencer acknowledged having difficulties with her telephone cutting out, so she could not state how much the dispatcher heard.  In addition, 911 calls are often rushed and provided in some degree of panic.

reasonable suspicion of criminal activity.  *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002).

Officers "are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).  " ... [T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."  *Id.* at 125.  An occupant of a residence which has just been fired upon and from which a  call was made for police assistance normally would not drive away before police arrive.  Flight from the scene of a crime (" ... the consummate act of evasion") has been recognized as suggestive of wrongdoing. *Id.*  A *Terry* investigative detention is appropriate in such circumstances, even though the actions may also have an innocent explanation.  *Id.* at 125-26.

The Eleventh Circuit has held that police presented with an emergency situation "must act quickly, based on hurried and incomplete information.  Their actions, therefore should be evaluated 'by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentally serious consequences.'"  *United States v. Holloway*, 290 F.3d 1331, 1339-40 (11th Cir. 2002), *quoting* 3 Wayne LaFave, *Search and Seizure* Section 6.6(a) at 391 (3d ed. 1996).  The " ... business of policemen and firemen is *to act*, not to speculate or mediate on whether [a 911 call] is correct.  People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process."  *Holloway, supra,* 290 F.3d at 1340 (internal citation omitted).

6

The Eleventh Circuit has on several occasions held apparent flight from police, particularly in a high crime area,  as a basis for an investigative detention.  *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003); *Hunter*, *supra,* 291 F.3d at 1306; *United States v. Gordon*, 231 F.3d 750, 756 (11th Cir. 2000).  Although in the instant case, the defendant did not flee from police, the fact the vehicle apparently had left the scene of a recent nearby shooting provided a reasonable and articuable basis for a *Terry* stop.  In *United States v. Jordan*, 232 F.3d 447, 449 (5th Cir. 2000), the court found the facts of a man running and looking over his shoulder in a high crime area at 6:45 p.m. did not "portray a recreational runner" and gave a sufficient appearance of fleeing from someone or something.  In that case, police had no knowledge of a specific crime having occurred.  In the instant case, they were aware of the reported shooting before 4 a.m. and had reason to believe the speeding vehicle and occupant had just left the area of the shooting.

Defendant argues that once he stepped out of the vehicle wearing a tee-shirt and shorts, he did not match the description of the suspect and the basis for a "high risk stop" (on the ground and handcuffed) disappeared.  The Court is not convinced.  Defendant is, at least arguably, a heavy set black male.  Although the clothes did not match the broadcast description, the broadcast was of clothes worn at the time of the shooting.  Any dark-colored jacket or pants could have been shed in the intervening minutes.  The officers reported they saw the defendant moving something in the vehicle before he exited it.

Defendant acknowledges that police may have been entitled to stop his vehicle for speeding, but claims that they should not have made a "high risk stop" under those

circumstances.[9]  Defendant claims police should have conducted additional investigation to see if he was a suspect, but instead acted as if they were trying to gather evidence against him.  The Eleventh Circuit has held that officers are allowed to draw their weapons and  to handcuff a person for their personal safety during a *Terry* detention.  *United States v. Hastamorir*, 881 F.2d 1551, 1556-57 (11th Cir. 1989).  *See also United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004), *United States v. Gil*, 204 F.3d 1347, 1350-51 (11th Cir. 2000).  The Fifth Circuit, in upholding the handcuffing of a *Terry*-stop detainee, has stated the question in determining whether  less intrusive measures could have been used to safely conduct the investigation is one of reasonableness.  *United States v. Jordan*, *supra*, 232 F.3d at 450.  The mere fact of handcuffing a suspect does not automatically convert detention into an arrest requiring probable cause.  *Id.*

The Court finds there  was sufficient reason for police to stop Defendant's vehicle and conduct a *Terry* search of his person.  Traffic violations (speeding, driving without working tail lights, or both) would have provided reason to stop the vehicle.  However, those traffic facts should not be examined in isolation, but as part of the totality of the circumstances.  *Gil, supra,* 204 F.3d at 1351.  Police also were aware by the time the vehicle stopped, about 4 a.m.,  that it was registered to a person apparently residing at an address from which a 911 call of shots being fired had been received only a few minutes

---

[9]Initially, in oral argument at the suppression hearing, defense counsel seemed to acknowledge the officers could have stopped the vehicle because the tail lights were out and he was speeding (Tr. 90).   However, in rebuttal argument, counsel noted that the fiancé had testified the car was in good working order and questioned whether the officers were correct as to the tail lights not functioning.  The Court does not find reason to doubt Officer Dickinson's testimony on that point, however, given the Court's analysis of the overall situation, it is not crucial to the holding.

previously.  The high-risk stop was not unreasonable under the circumstances.

*The Question*

At the suppression hearing, the United States stated it was not arguing that the defendant was not in custody after he was handcuffed, but asserted the officers properly asked the defendant about firearms before advising him of his constitutional rights[10] because of the public safety exception adopted in *Quarles, supra,* 467 U.S. 649 (1984).

In *Miranda, supra*, 384 U.S. at 436, the Supreme Court held that in order to protect the Fifth Amendment right against forced  incrimination, police would have to advise persons being interrogated in police custody of their right to counsel, including appointed counsel, and their right to refuse to answer questions.  In *Quarles, supra,* 467 U.S. at 657-59, the Court held that in a situation in which a threat to public safety outweighs the need for the prophylactic rule imposed by *Miranda*, the warnings would not be required.

In *Quarles*, the defendant was arrested in a grocery store after a rape victim identified him and said he had a firearm.  Quarles disappeared behind shelving briefly before his arrest and was wearing an empty holster when arrested. Police asked him where the gun was before advising him of his *Miranda* rights.  The Court found the danger of the

---

[10]Because of this concession, the Court is assuming without deciding that the defendant was in custody. The officers had told him he was not under arrest.  The Court would note that a *Terry* detention, even if at gunpoint and  handcuffs are used, does not automatically create a custody situation.  *See United States v. Gil*, 204, F.3d 1347, 1351 (11th Cir. 1991)*; Hastamorir, supra,* 881 F.2d 1551, 1557; *United States v. Roper*, 702 F.2d 984, 987-88 (11th Cir. 1983).  Restriction on movement is one factor in determining custody, but by itself is not sufficient to "transform a *Terry* stop into a *de facto* arrest." *Hastamorir, supra,* 881 F.3d at 1556.  For a discussion of the factors in determining whether a *Terry* detainee is entitled to *Miranda* warnings,  see *United States v. Acosta*, 363 F.3d 1141, 1148-1150 (11th Cir. 2004).  In *Quarles, supra,* at 652, however, the Court held that the defendant arrested and handcuffed in the grocery store was in custody.

9

gun being hidden in a public store where an accomplice, customer or employee might find

it created a public safety issue:

> " We hold that on these facts there is a "public safety" exception to the
> requirement that Miranda warnings be given before a suspect's answers may
> be admitted into evidence, *656 and that the availability of that exception
> does not depend upon the motivation of the individual officers involved. In a
> kaleidoscopic situation such as the one confronting these officers, where
> spontaneity rather than adherence to a police manual is necessarily the order
> of the day, the application of the exception which we recognize today should
> not be made to depend on post hoc findings at a suppression hearing
> concerning the subjective motivation of the arresting officer. [footnote
> omitted] Undoubtedly most police officers, if placed in Officer Kraft's position,
> would act out of a host of different, instinctive, and largely unverifiable
> motives--their own safety, the safety of others, and perhaps as well the
> desire to obtain incriminating evidence from the suspect.
>
> Whatever the motivation of individual officers in such a situation, we do not
> believe that the doctrinal underpinnings of  Miranda require that it be applied
> in all its rigor to a situation in which police officers ask questions reasonably
> prompted by a concern for the public safety."

*Quarles, supra*, 467 U.S. at 655-56.

Although in *Quarles,* the concern was primarily for  "public safety" because the

location was a grocery store, the exception also has been applied for the safety of the

officers.  *See, e.g., United States v. Newton,* 369 F.3d 659, 679 (2d Cir. 2004) (man

arrested and handcuffed in apartment asked whether there is anything police need to be

aware, leading to statement that a gun was in the closet)*; United States v. Reyes,* 353 F.3d

148, 154 (2d Cir. 2003) (questions to narcotics suspect as to weapons on his person prior

to frisk)*;  United States v. Williams,* 181 F.3d 945, 953-54 (8th Cir. 1998) (handcuffed

narcotics suspect arrested in apartment asked if there was anything police needed to be

aware of); *United States v. Shea*, 150 F.3d 44, 47-48 (1st Cir. 2003) (*abrogated on other

grounds*) (bank robbery suspect asked if he had any weapons)*; United States v. Carrillo,*

10

16 F.3d 1046, 1049-50 (9th Cir. 1994) (same); *United States v. Edwards*, 885 F.2d 377, 384

(7th Cir. 1989) (narcotics suspect arrested at gunpoint and asked if he had a gun).

Although there have been dozens of subsequent cases analyzing the "public safety

exception" and numerous law review articles concerning it,[11] it does not appear that the

Eleventh Circuit has any published opinions relying on *Quarles*.[12]  The Fifth Circuit,

however, in an *en banc* opinion prior to *Quarles,* found an officer-safety exception to

*Miranda* in *United States v. Castellana*, 500 F.2d 325, 326 (5th Cir. 1974).[13]  In that case,

the court of appeals held officers executing a search warrant at a business could ask the

operator if he had any weapons within reach. Additional questions as to where the weapon

came from were not allowed.

[11]*See, e.g.*, Alan Raphael, The Current Scope of the Public Safety Exception to *Miranda* under *New York v. Quarles,* 2 N.Y.City L.Rev. 63 (1998); Jim Weller, The Legacy of *Quarles*: A Summary of the Public Safety Exception to *Miranda* in the Federal Courts, 49 Baylor L.Rev. 1107 (1997); Marc Schuyler Reiner, Note, The Public Safety Exception to *Miranda*: Analyzing Subjective Motivation, 93 Mich. L. Rev., 2377 (1995); Daniel Brian Yeager, Note, The Public Safety Exception to *Miranda* Careening Through the Lower Courts, 40 U. Fla. L. Rev. 989 (1988).

[12]The Eleventh Circuit has affirmed without opinion a conviction based in part on evidence as to which the district court denied a motion to suppress statements which the United States defended under the officer-safety exception.   *United States v. Parrish,* 81 F.3d   174 (11th Cir. 1996)(table).  The Eleventh Circuit opinion is thus not precedent under U. S. Ct. Of App. 11th Cir. R 36-2.  In that case, however, the District Court denied the motion to suppress statements based upon a Report and Recommendation of then Magistrate Judge John E. Steele (now U.S. District Judge). *United States v. Parrish*, Crim. Action No. 3:94-cr-00024-J-16, M.D.Fla., docket entry 119.   Police were executing a search warrant and escorted one suspect into the living room and asked her if there were any weapons in the room.  She told them where a firearm was located.  The female suspect was not advised of *Miranda* rights.

[13]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981 (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

In several circuits, the courts have held that officers may ask persons in custody about weapons in a variety of circumstances. *See, e.g.*, *Fleming v. Collins*, 954 F.2d 1109 (5th Cir. 1992)(en banc) (questions to a wounded man being held at gunpoint near the scene of a bank robbery); *United States v. Brady*, 819 F.2d 884 (9th Cir. 1987) (man suspected of hitting woman removed from car at gunpoint and handcuffed asked if had gun in the car; location was high-crime area and crowd was gathering); *United States v. Reilly,* 224 F.3d 986, 992 (9th Cir. 2000) (agents arresting bank robbery suspect in motel room at gunpoint asked "where is the gun" while preparing to handcuff defendant; the court held the question was not investigatory, but "was sufficiently limited in scope to allow the officers to quell the volatile situation they faced").

Clearly, in those cases in which the suspect has not yet been searched or frisked, the necessity for the exception is clearer.  However, the fact that the officers in the instant case had temporary control over the defendant does not mean they understood the totality of the still developing situation or had no reason to be concerned with their safety or that of others.

In *Fleming, supra,* 954 F.2d at 1109, the two judges who dissented in the *en banc* opinion did so on the basis of questions that continued after the suspect admitted he had a firearm that he had thrown away, not the initial questions.  "Until police knew what the situation was there was every right to explore exactly what the circumstances were that led to the tableau that the two policewomen had come upon." *Id.*

There are cases in which the courts have declined to apply *Quarles* on the basis that police have the situation well in hand, thus the need for the public safety questions was not present. In *United States v. Raborn*, 872 F.2d 589 (5th Cir. 1989) police saw the defendant

12

put a gun in a truck before they arrested him, but did not find it in a quick search, so asked him where he put it.  Because police were arresting the defendant based on probable cause, the search was upheld even though the question was found in violation of *Miranda.* The truck was parked along a rural road and had been seized by police and the court found no public access was likely. *Id.*  In *United States v. Mobley*, 40 F.3d 688, 692-93 (4th Cir. 1994) the court found that once police had arrested and cuffed a naked man who had been alone in his apartment and a search warrant was planned, there was no safety need to ask about weapons.  However, in *United States v. Williams,* 282 F.Supp.2d 586, 596 (E.D.Mich. 2003) the court noted that even after an arrest of a driver, officers could not know if there were weapons or hazardous items in a vehicle that might harm officers if they happened upon them while searching the vehicle.

Defendant  relies upon *State v. Alexander*, 810 So.2d 552 (1st DCA Fla. 2002).  In that case an officer had arrested an 18-year-old boy for armed robbery on the insistence of the boy's father at their house.  The officer had believed the firearm used had been abandoned in a lake near the robbery location, but made a comment to the father about "the issue of the firearm."  The father said he would find out and the son, apparently intimidated, revealed the firearm was under a mattress.  The appellate court reversed an order suppressing the statement, finding there was no "functional equivalent of questioning."  However, the court added that the *Quarles* public safety exception would not be applicable because there was no indication the officer had any imminent concern for the public, having been told previously the fireman was in the lake. *Id.*

The Court does not find *Alexander* provides any guidance in the instant case.  The

officers believed the defendant Hall had come from a location at which shots had been fired. That they may have been mistaken in any belief or suspicion the defendant had taken part in the shooting does not subtract from having reasonable ground to believe the defendant might have a firearm. Also, unlike the situation in *Raborn, Mobley* and *Alexander*, in the instant case the defendant had not been arrested and there was no probable cause for arrest. There also was no basis for continued custody of Hall or his vehicle unless police learned something during the *Terry* stop. Thus, the defendant likely would have returned to the vehicle.

In that situation, police had reason to be concerned for their safety as well as public safety. Police knew there had been shots fired by some kind of weapon, and reason to associate the defendant's vehicle to the shooting scene. As in *Quarles,* they wanted to secure the weapon. Although *Fleming* is factually distinct, there are two common elements: (1) a suspect being located near, but not at, the original crime scene, and (2) an uncertain and potential dangerous "kaleidoscopic" situation until the facts became clear. Thus, there was a reasonable basis for concern about safety and locating any firearms. There is nothing to suggest improper subjective motivation by police in asking if there were firearms in the vehicle, even if, as one law review article suggests, such an inquiry is proper.[14] The firearm question here was asked spontaneously and simply. Although

---

[14]The Court in *Quarles* stated the "application of the exception .... should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer." *Quarles, supra,* 467 U.S. at 656. One commentator has suggested that the quoted language does not prevent courts from using a two-part test: (1) analyzing the subjective motivation of the officer as revealed by objective factors including the content of the question, when they were asked and when the suspect was advised of his rights, and (2) examining the objective circumstances to determine the reasonableness of the officer's belief of an emergency.

*Miranda* rights were not provided to the defendant after the weapons were found, the United States has indicated it would not seek to introduce any another comments made by the defendant at that time or during the transport to the police station.

### The Search of Car

The United States claims that after learning there were firearms in the vehicle, the officers were entitled to search the vehicle and seize them.  Defendant maintains that if the un-*Mirandized* question was improper, the search then becomes fruit of the poisonous tree.

Although the Court has found that the question was proper under the circumstances, even it were improper, the officers were justified in searching the passenger compartment as part of the initial *Terry* stop if they reasonably believed the suspect dangerous. *Michigan v. Long*, 463 U.S. 1032, 1049-51 (1983).  In *Long*, police had stopped behind a vehicle which had swerved into a shallow ditch.  The driver was behind the vehicle when police arrived, but was not responsive to their questions and started walking toward an open front door of the vehicle.  Police stopped him, patted him down and then looked inside the vehicle, and observed what appeared to be marijuana.  They then arrested the driver. The driver claimed the police could not search the vehicle because *Terry* allows only a pat-down of the person rather than a search of the area, and the Michigan Supreme Court agreed with that argument.

The Supreme Court reversed, noting that *Terry* had held that an officer with a reasonable belief that the person he is investigating could be dangerous, must be allowed to take "necessary measures" and "neutralize the threat of physical harm."  *Long,* 463 U.S.

---

Marc Schuyler Reiner, Note The Public Safety Exception to *Miranda:* Analyzing Subjective Motivation, 93 Mich.L.Rev. 2377, 2378 (1995).

at 1047, *quoting Terry,* 392 U.S. at 24.   In *New York v. Belton*, 453 U.S. 454, 460 (1981), the Court held that if a person is arrested at his or her vehicle, the passenger compartment of the vehicle is generally "the area into which an arrestee might reach in order to grab a weapon."

In *Long,* the Court noted that roadside encounters are especially dangerous to police, and that a search of the passenger compartment of a vehicle, limited to the areas in which a weapon may be hidden, is permissible in a *Terry* detention if the officer has a reasonable belief based on facts and "rational inferences" that the suspect could be dangerous and gain control of weapons. *Long, supra,* 463 U.S. at 1049.  The defendant argued that he was effectively under police control and that  it was not reasonable for the officers to fear he could obtain an item from the car to harm them.  The Court rejected that argument because the detainee could break away from the officers.  *Id.* at 1051.[15]

In *United States v. Aldridge,* 719 F.2d 368, 372 (11th Cir. 1983), the Eleventh Circuit applied *Long* in allowing an officer stopping a vehicle at 3 a.m. to frisk the driver and search the passenger compartment for weapons.  There were passengers in the vehicle which compounded the safety issues, however.

In the instant case, Defendant was handcuffed, where the defendant in *Long* was not.  However, in *Long* the Court noted that if the detainee is not "placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Long, supra,* at 1052.  Although the Charleston police had reason to stop and

---

[15]However, in *Knowles v. Iowa*, 525 U.S. 113, 118-19 (1998), the Court declined to allow officers the right to search a vehicle automatically in conjunction with the issuance of a speeding citation.

16

detain Defendant in the instant case, they did not have probable cause to arrest him prior to his statement as to having firearms in the vehicle.[16]  Thus, if he had not mentioned the weapons, and if police had not searched the vehicle, police would have had to unlock his handcuffs and released Defendant who could have returned to the vehicle.  Given that police  were investigating a reported shooting at the address from which the vehicle was registered, the officers had a reasonable basis for belief the suspect could be armed or dangerous.

Thus, the officers were entitled to make a limited search of the passenger compartment of the vehicle as part of the *Terry* stop.  The firearms were found between the driver's seat and console (the same type area the marijuana was noticed in *Long*) and under the passenger seat.  They would have been in easy access whenever Defendant returned to his car.  *United States v. Wallen*, 388 F.3d 161, 166 (5th Cir. 2004); *United States v. Holmes*, 376 F.3d 270, 278-80 (4th Cir. 2004).

In addition, once Defendant acknowledged he had firearms in the vehicle, police had probable cause to search for the weapons as evidence of a crime, possession of concealed firearms.  *See Brady, supra,* 819 F.2d at 899.

---

[16]Actually, the federal arrest warrant for Defendant was outstanding at the time, but for whatever reason, the Charleston police did not connect that warrant to the Defendant.   After discovery of the firearms, Defendant was arrested on a concealed weapon charge, and later released on bond.   Only subsequently did police become aware of the federal warrant.  For that reason, the Court will not apply the inevitable discovery rule.

17

On either basis, the Motion to Suppress the seizure should be denied.

**DONE AND ENTERED** at Jacksonville, Florida this 17<u>th</u> day of May, 2005.

_Thomas E. Morris_
**THOMAS E. MORRIS**
United States Magistrate Judge

Copies to:
U.S. Atty.  (Talbot)
Donald Mairs
Hon. Harvey E. Schlesinger